

No. 3:19-CR-173-CWR-FKB

United States of America,

*Plaintiff,*

*v.*

Melecia Baltazar-Sebastian,

*Defendant.*

Memorandum Opinion and Order

Before Carlton W. Reeves, *District Judge*.

The United States has charged Melecia Baltazar-Sebastian with one count of misusing a Social Security number. It arrested her and promptly brought her before a United States Magistrate Judge for a detention hearing. After considering the parties' evidence, their arguments, and the applicable law, the Magistrate Judge ordered Baltazar-Sebastian to be released until her trial. The Order required Baltazar-Sebastian to remain in the Southern District of Mississippi.

No one appealed the Magistrate Judge's Order. That would normally be the end of the matter. Here, however, an agency within the United States Department of Homeland Security – Immigration and Customs Enforcement (ICE) – decided that the Order does not apply to it. ICE took custody of Baltazar-Sebastian and transported her to a detention facility in Louisiana for deportation proceedings.

Baltazar-Sebastian, through her attorney, filed a series of motions in this Court objecting to the government's circumvention of the Magistrate Judge's Order. Two hearings followed. All of the briefs and arguments concern the same question: does federal law permit ICE to override the Magistrate Judge's Order releasing Baltazar-Sebastian on bond?

For the reasons discussed below, the answer is "no." In the absence of a statute indicating that Congress authorized ICE to circumvent the Magistrate Judge's Order, and without appealing that Order, ICE was not permitted to move Baltazar-Sebastian to Louisiana. While ICE may continue removal proceedings, the defendant is required to remain in this Judicial District under bond conditions where she and her attorney can prepare for trial.

Accordingly, the Court affirms once more the pretrial release of Baltazar-Sebastian subject to conditions determined by the Magistrate Judge. Once the criminal proceedings regarding this defendant are finished, this Court's role in the matter is complete, and the Executive Branch will then be free to detain her for removal proceedings.

## I. Factual Background

Melecia Baltazar-Sebastian was born in Guatemala in 1979. The facts behind her relocation to Mississippi are not known

at this time, but it is clear that she made a home in this state. She lived in Morton, Mississippi, raised a family, and found a faith community at the Catholic Church of Saint Martin of Porres.

Baltazar-Sebastian also goes by "Amparo Sanchez." In Spanish, "amparo" means "refuge" or "protection." *United States v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir. 1994); *A. S. (Widow) v. Advance Am. Diving*, No. 2007-LHC-505, 2008 WL 10656987, at *4 n.2 (Dep't of Labor Apr. 11, 2008).[1] The record does not explain the origin of Baltazar-Sebastian's use of this name. Future proceedings may resolve whether that was the name she gave to the chicken processing plant that employed her, whether it is her nickname, or something else.

In 2017, the Division of Children Services of the U.S. Department of Health and Human Services Office of Refugee Settlement released Baltazar-Sebastian's then 17-year-old daughter, also named Melecia, into her mother's care under the Homeland Security Act of 2002 and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008. Beyond raising and educating her daughter, Baltazar-Sebastian was required to ensure that her daughter appeared at all immigration proceedings. There is no evidence of non-compliance in the record. Baltazar-Sebastian bought a car in 2018,

---

[1] One remedy in the Mexican legal system is the "writ of amparo," *In re Extradition of Vargas*, 978 F. Supp. 2d 734, 741 n.3 (S.D. Tex. 2013), which is "a federal proceeding which may be brought by any person who believes that his constitutional rights are being violated by a public official, even when the official is acting within the scope of authority conferred by statute or regulation," Robert S. Barker, *Constitutionalism in the Americas: A Bicentennial Perspective*, 49 U. PITT. L. REV. 891, 906 (1988).

secured a job, and had no criminal history to speak of until August 7, 2019.

That day, more than 600 federal agents conducted immigration enforcement actions at six chicken processing plants in central Mississippi. Baltazar-Sebastian was one of 680 persons taken into custody.[2] Two weeks later, a federal grand jury in the Southern District of Mississippi indicted her for one count of misusing a Social Security number. There have been 118 other indictments filed in this District as a result of the August 7 enforcement actions.[3]

On September 3, 2019, a detention hearing was held before Magistrate Judge Linda R. Anderson. As in each detention hearing in this District, the government was represented by the United States Attorney's Office. Counsel for Baltazar-Sebastian provided evidence through documents and the testimony of three witnesses regarding her client's residence, church fellowship, commitment to care for her daughter, and daughter's school records. Judge Anderson concluded that Baltazar-Sebastian was not a danger to the community or a flight risk. Accordingly, Judge Anderson issued an Order re-

---

[2] Vandana Rambaran, *ICE raids on Mississippi food processing plants result in 680 arrests*, FOX NEWS (Aug. 7, 2019), https://www.foxnews.com/us/ice-raids-on-mississippi-food-processing-plants-result-in-680-arrests.

[3] United States Attorney's Office: Southern District of Mississippi, *119 Illegal Aliens Prosecuted For Stealing Identities of Americans, Falsifying Immigration Documents, Fraudulently Claiming to be U.S. Citizens, Other Crimes*, UNITED STATES DEP'T OF JUSTICE (Nov. 7, 2019), https://www.justice.gov/usao-sdms/pr/119-illegal-aliens-prosecuted-stealing-identities-americans-falsifying-immigration.

leasing Baltazar-Sebastian on bond subject to specific conditions, including that she "remain in the Southern District of Mississippi at all times during the pendency of these proceedings unless special permission is obtained from the Court." Docket No. 14 at 2. The government did not appeal Judge Anderson's Order.

Baltazar-Sebastian was not released. ICE immediately took her into custody and transferred her to a holding center in Louisiana. For an extended period of time, Baltazar-Sebastian's whereabouts were unknown to her daughter and her attorney. Baltazar-Sebastian was not able to communicate with her attorney about her case.[4] On September 13, 2019, she appeared before an Immigration Judge in Louisiana. The hearing was continued to give her time to find an immigration attorney.

On September 25, 2019, in this criminal case, the United States filed a Motion for Writ of Habeas Corpus Ad Prosequendum to ensure that Baltazar-Sebastian would be present at a hearing before this Court. The motion was granted by Magistrate Judge F. Keith Ball. Counsel for Baltazar-Sebastian then filed two motions of her own: (1) to set aside the Writ, and (2) to clarify her client's conditions of release. Counsel argued that because Baltazar-Sebastian had been released on bond by the Magistrate Judge, her continued detention by ICE was unlawful.

---

[4] It was not just that Baltazar-Sebastian could not visit with her counsel. Baltazar-Sebastian literally could not communicate with her counsel because she speaks an indigenous language, Akateco. There are very few Akateco interpreters, which magnifies the difficulty for her to communicate with her attorney.

A hearing was held on October 15, 2019. Baltazar-Sebastian asked the Court to enforce Judge Anderson's Order of Release. This Court granted Baltazar-Sebastian's request and promised a detailed written order. The United States' motion for reconsideration followed shortly thereafter. Another hearing was held on November 18, 2019, this time with representatives from the United States Attorney's Office, the Department of Justice (Main Justice), and ICE.[5] The Court's full ruling follows.

## A.    Relevant Law

This case requires the Court to analyze the Bail Reform Act of 1984 (BRA), 18 U.S.C. § 3141 *et seq.*, and the Immigration and Nationality Act of 1965 (INA), 8 U.S.C. § 1101 *et seq.*

### 1.    The Bail Reform Act

"In our society liberty is the norm, and detention prior to trial or without a trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Congress understood this when it enacted the BRA, which provides that a "judicial officer shall order the pretrial release" of a person charged with a federal crime, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."[6] 18 U.S.C. § 3142(b). "The word

---

[5] The Court did not consider Baltazar-Sebastian's supplemental brief as it was untimely and submitted without leave of Court.

[6] "A determination that an individual is a flight risk must be supported by a preponderance of the evidence." *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (citation omitted). On appeal, the factual finding is reviewed for clear error. *Id.*

'shall' is mandatory in meaning." *United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018), *as revised* (Nov. 27, 2018) (citing *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001)). Pursuant to this language, "the presumption is release absent a demonstration that the defendant is likely to flee or is a danger to the community." *United States v. Espinoza-Ochoa*, 371 F. Supp. 3d 1018, 1020 (M.D. Ala. 2019) (citation omitted).

The BRA expressly contemplates pretrial release for aliens. *See United States v. Adomako*, 150 F. Supp. 2d 1302, 1304 (M.D. Fla. 2001). Section 3142(d) of the Act provides that if a judicial officer determines that an alien "may flee or pose a danger to any other person or the community, then the judicial officer shall order the temporary detention of such person in order for the attorney for the government to notify the appropriate official of the Immigration and Naturalization Service." *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1174 (D. Or. 2012) (citing 18 U.S.C. § 3142(d)) (quotation marks and emphasis omitted). This temporary detention may not exceed 10 days. 18 U.S.C. § 3142(d). The statute continues, "[i]f the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." *Id.* "The ordinary meaning of notwithstanding is in spite of, or without prevention or obstruction from or by." *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 939 (2017) (quotation marks and citations omitted). The use of "notwithstanding" in a statute "shows which provision prevails in the event of a clash." *Id.* (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 126-27 (2012)).

No other section in the BRA addresses aliens, nor are there special or additional conditions placed on such persons. Congress chose not to make any other distinction between citizens and aliens. Outside of § 3142(d), Congress required that detainees be treated alike.

### 2.    The Immigration and Nationality Act

"An illegal alien is detained under the INA to facilitate his removal from the country." *United States v. Vasquez-Benitez*, 919 F.3d 546, 553 (D.C. Cir. 2019) (citing 8 U.S.C. § 1231(a)(2)).

Section 1226(a) of the INA states that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Though § 1226(a) generally makes an alien's detention permissive, § 1226(c) provides specific instances when continued physical custody of an alien is mandated. *Id.* § 1226(a), (c). For example, if an alien has been convicted of committing an aggravated felony within the United States, then § 1226(c) requires detention. *Id.* § 1226(c)(1)(B).

In the INA, Congress instructed the Executive Branch to remove an alien from the United States within 90 days from when the alien is subject to a removal order. *Id.* § 1231(a)(1)(A). This 90-day period is known as the "removal period." The removal period begins to run on the latest of the following:

> (i)    The date the order of removal becomes administratively final.

> (ii)    If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii)    *If the alien is detained or confined* (except under an immigration process), *the date the alien is released from detention or confinement.*

*Id.* § 1231(a)(1)(B) (emphasis added).

A defendant released on conditions of pretrial supervision is deemed "confined" because she is subject to restraints not shared by the general public. *See Hensley v. Mun. Ct.*, 411 U.S. 345, 351 (1973). It follows that because an alien released on pretrial bond is still technically "confined," the 90-day removal period for such a defendant has yet to begin. While an Article III criminal proceeding is ongoing, therefore, ICE is under no time constraint to deport the alien-defendant.

The INA also authorizes the Executive Branch to establish regulations to enforce the statute and "all other laws relating to the immigration and naturalization of aliens . . . ." 8 U.S.C. § 1103(a)(1), (3). Under this authority, the Executive Branch has issued several regulations, including one commonly known as the "ICE detainer." The "detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a). The purpose of an ICE detainer, then, is to secure and remove an alien.

ICE does not, however, have authority to sidestep the BRA and detain a defendant "for the sole purpose of ensuring [the alien's] presence for criminal prosecution." *United States v. Soriano Nunez*, 928 F.3d 240, 245 (3d Cir. 2019); *see also Vazquez-Benitez*, 919 F.3d at 552.

Two further INA regulations are pertinent to our case. First, 8 C.F.R. § 215.2(a) provides that "[n]o alien shall depart, or attempt to depart, from the United States if his departure would be prejudicial to the interests of the United States under the provisions of § 215.3." Section 215.3, in turn, provides that departure from the United States of "any alien who is needed in the United States . . . as a party to[] any criminal case under investigation or pending in a court in the United States" is deemed prejudicial. 8 C.F.R. § 215.3(g). This regulation then clarifies that an alien who is party to a pending criminal case "may be permitted to depart from the United States with the consent of the appropriate prosecuting authority, unless such alien is otherwise prohibited from departing under the provisions of this part." *Id.*; *see also Trujillo-Alvarez*, 900 F. Supp. 2d at 1178-79.

Reading these regulations together indicates that by pursuing a criminal case against an alien, the Executive Branch itself has determined that an ongoing criminal proceeding takes priority over removal. Once a criminal proceeding is complete, removal is no longer prejudicial to the United States' interests and the Department of Homeland Security is free to deport the individual subject to a final removal order.

### 3. Court Orders

"When the district court enters an order in a case, we expect the affected persons to abide by the order," United States Attorney Robert K. Hur said a few weeks ago.[7]

---

[7] United States Attorney's Office: District of Maryland, *Wife of Ponzi Scheme Perpetrator Pleads Guilty to Federal Charge for Conspiring to Remove and Conceal Assets in Violation of Court Orders*, UNITED STATES DEP'T OF JUSTICE (Oct. 9, 2019), https://www.justice.gov/usao-md/pr/wife-ponzi-

"[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *Matter of Jones*, 966 F.2d 169, 173 (5th Cir. 1992) (citing *Maness v. Meyers*, 419 U.S. 449, 459 (1975)). "Trial judges and opposing litigants have a right to expect that the court's orders will be carefully followed in order that the business of the court may be handled expeditiously and fairly." *Woods v. Burlington N.R. Co.*, 768 F.2d 1287, 1290 (11th Cir. 1985), *rev'd on other grounds*, 480 U.S. 1 (1987). When a party believes an order is incorrect, its remedy is to appeal, "but, absent a stay, [it] must comply promptly with the order pending appeal." *Matter of Jones*, 966 F.2d at 173 (citation omitted).

District courts have inherent power to enforce "their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citations omitted). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (citation omitted). A noncompliant party risks fines, sanctions, or even incarceration until compliance is achieved. *See, e.g., Nelson v. United States*, 201 U.S. 92, 96–97 (1906). Willful disobedience of a court order can

---

scheme-perpetrator-pleads-guilty-federal-charge-conspiring-remove-and-conceal.

Even more recently, Attorney General William Barr delivered an address chastising those persons and entities "engaged in the systematic shredding of norms and the undermining of the rule of law." William P. Barr, Attorney Gen., Dep't of Justice, 19th Annual Barbara K. Olson Memorial Lecture at the Federalist Society's 2019 National Lawyers Convention (Nov. 15, 2019).

justify dismissal with prejudice. *See, e.g.*, *In re Deepwater Horizon*, 922 F.3d 660, 666 (5th Cir. 2019).

## II.   Discussion

### A.   Textual Analysis

#### 1.   Interpreting the BRA, the INA, and the INA Regulations

The parties have devoted considerable attention to whether the BRA and the INA conflict in this case. "Because this is a question of statutory interpretation, we begin with the text of the statute[s]." *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 420 (5th Cir. 2018) (citation omitted).

"The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." *Christiana Tr. v. Riddle*, 911 F.3d 799, 806 (5th Cir. 2018) (citation omitted); *see generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) [hereinafter SCALIA & GARNER]. "[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Custom Rail Emp'r Welfare Tr. Fund v. Geeslin*, 491 F.3d 233, 236 (5th Cir. 2007) (citation omitted). Another well-established canon of statutory interpretation instructs that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). "[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).

"In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* at 133 (citations omitted). "[W]e presume that Congress is aware of existing law when it passes legislation." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (quotation marks and citation omitted).

Congress created a comprehensive statutory scheme with the BRA. It knew that aliens were bound to be arrested and charged with federal crimes. So Congress set out a specific avenue for judicial officers to follow when faced with an alien-defendant's motion for pretrial release.

If an alien-defendant is a flight risk or danger to the community, § 3142(d) of the BRA requires the court to notify all agencies – federal, state, and local – who may have an interest in the alien-defendant. The court must then hold the alien-defendant for 10 days. If no agency picks up the alien-defendant within that time, then "such person shall be treated in accordance with the other provisions of this section . . . ." 18 U.S.C. § 3142(d).

Section 3142(d) is the only part of the BRA that distinguishes aliens from citizens. This drafting decision is entitled to deference, under the principle that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citations omitted); *see also AU Optronics Corp.*, 571 U.S. at 169 (citing *Dean v. United States*, 556 U.S. 568, 573 (2009)).

Given that Congress singled out aliens in only one portion of the entire statutory scheme of the BRA, it logically follows that, in the rest of the BRA, Congress intended aliens and citizens to be treated alike. Thus, if an alien-defendant is *not* a flight risk or a danger, then the usual provisions of the BRA apply.

Baltazar-Sebastian's case is one in which the BRA and the INA are capable of peaceful coexistence. She is a pre-trial defendant – meaning she is subject to § 3142 of the BRA. In § 3142(b), Congress requires a judicial officer to release a defendant on bond unless the judicial officer "determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Judge Anderson applied the BRA to the evidence before her and concluded that Baltazar-Sebastian was neither a flight risk nor a danger to the community. Based on these findings, Judge Anderson followed Congress' instructions and ordered Baltazar-Sebastian's release on bond subject to conditions.

ICE nevertheless immediately took custody of Baltazar-Sebastian and transported her to Louisiana. Rather than appeal the Magistrate Judge's Order, ICE violated the conditions Judge Anderson set forth: 1) that Baltazar-Sebastian be released to her home, and 2) that she remain within the Southern District of Mississippi.

ICE and DOJ argue that a Magistrate Judge's order is irrelevant when it comes to ICE's power to detain an alien-defendant. They contend that the classification of immigration as a civil issue coupled with the issuance of an ICE detainer requires courts to make an exception to the detention plan Congress set forth in the BRA. In short, they argue that anyone with an ICE detainer may be detained notwithstanding a Magistrate Judge's Order of Release. Respectfully, this Court disagrees.

First, the plain language of the statutes suggests an order of precedence. On one hand, the INA states that the Secretary of Homeland Security *may* detain an alien like Baltazar-Sebastian during removal proceedings, but it does not mandate such detention. 8 U.S.C. § 1226(a). On the other hand, the BRA *does* mandate that alien-defendants like Baltazar-Sebastian be released on bond while awaiting trial. 18 U.S.C. § 3142(b).

Next, in § 3142(d), Congress contemplated the situation in which multiple agencies would have an interest in the same alien-defendant, and it laid out a specific framework to be followed in such circumstances. To read an "ICE detainer" exception into the statute would disregard this process. It would also render a court order meaningless. If Congress had intended that, surely it would have said so.

Finally, the straightforward text of the relevant INA regulations reveals the logical fallacy at the heart of ICE's action in this case. ICE has the authority to detain an alien solely for the purpose of removing and deporting the alien. *See Vasquez-Benitez*, 919 F.3d at 552. Under 8 C.F.R. §§ 215.2(a) and 215.3(g), however, removing an alien-defendant is prejudicial to the

United States without the prosecutor's permission.[8] No such permission has been granted in this case. It follows that removing Baltazar-Sebastian from the country would be prejudicial to the United States. And if ICE cannot remove her, it cannot detain her *for removal purposes*.[9]

### 2.    ICE's Interpretation of its Regulations

During the hearing on its Motion for Reconsideration, the government argued that courts have misinterpreted 8 C.F.R. §§ 215.2(a) and 215.3(g). It asserts that the term "departure" in § 215.2(a) refers solely to an alien's *voluntary* departure. In other words, ICE contends that it can remove an alien-defendant even if – under its own regulations – departure of the alien would be prejudicial to the United States.

This Court has difficulty understanding how the government reads "voluntary" into the section. The word is not there. As Justice Scalia and Professor Garner remind us, a court cannot "enlarge or improve or change the law . . . . The absent provision cannot be supplied by the courts." Scalia & Garner at 93-94 (quotation marks and citations omitted). If ICE wishes to add the word voluntary, it must go through the process necessary to amend a federal regulation.

---

[8] There is no evidence that ICE has obtained "the consent of the appropriate prosecuting authority" necessary to remove Baltazar-Sebastian from the United States. 8 C.F.R. § 215.3(g).

[9] This is not to say that any detention of an alien-defendant during criminal proceedings is prohibited. Again, the BRA permits continued detention of an alien-defendant if a judicial officer finds that the defendant is a flight risk or poses a danger to the community.

Other regulations within the same section and chapter of the Code of Federal Regulations specifically use the term voluntary as it relates to departure. *See* 8 C.F.R. § 215.3(j); *see also* 8 C.F.R. §§ 236.15 and 240.25. The term's inclusion in some sections and exclusion in others indicates that the exclusion of "voluntary" in § 215.2(a) was intentional. *See Russello*, 464 U.S. at 23.

The government likely believes that its reading of the regulations is reasonable and entitled to deference. *See Auer v. Robbins*, 519 U.S. 452, 457 (1997). *Auer* deference to an agency's reading of an ambiguous regulation continues to play an important role in construing agency regulations. When *Auer* deference is applicable, it "gives an agency significant leeway to say what its own rules mean." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019). By doing so, "the doctrine enables the agency to fill out the regulatory scheme Congress has placed under its supervision." *Id.* However, *Auer* deference is warranted "only if a regulation is genuinely ambiguous." *Id.* at 2414. A court must have exhausted "all the traditional tools of construction" and concluded that the "question still has no single right answer . . . ." *Id.* at 2415 (quotation marks and citations omitted).

Here, the regulations at issue are not ambiguous, and the government has not argued that such ambiguity exists. Application of basic statutory tools renders the plain meaning of the regulations clear. Therefore, *Auer* deference to ICE's interpretation is inappropriate in this situation.

### 3. Jurisdiction

The government also implies that this Court lacks jurisdiction because it does not have the power to review immigration decisions of the Secretary of Homeland Security. Specifically, the government notes that in relation to removal proceedings, "[n]o court may set aside any action . . . or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e). Furthermore, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary] to commence proceedings . . . ." *Id.* § 1252(g).

This jurisdictional argument is puzzling. The INA makes clear that district courts cannot set aside immigration decisions or entertain causes of action stemming from Homeland Security's decision to proceed with removal. However, this Court is not attempting to review or set aside any decision or action to commence removal proceedings. The Court is simply attempting to enforce the Magistrate Judge's Order – an action well within this Court's jurisdiction. When it comes to a district court enforcing its own (or adopted) orders, §§ 1226(e) and 1252(g) of the INA are simply irrelevant.

### B. The Government's Extra-Textual Arguments

The government argues that the Court's reading of the BRA, the INA, and the INA regulations is wrong. As mentioned above, in earlier cases it has argued for an "ICE detainer" exception to the BRA – specifically asserting that any defendant with an ICE detainer must be held during the pendency of a federal criminal case no matter how a Magistrate Judge has ruled.

A number of District Courts have been unconvinced. *See United States v. Boutin*, 269 F. Supp. 3d 24, 26 (E.D.N.Y. 2017) ("When an Article III court has ordered a defendant released, the retention of a defendant in ICE custody contravenes a determination made pursuant to the Bail Reform Act."); *Trujillo-Alvarez*, 900 F. Supp. 2d at 1177; *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111 (D. Minn. 2009) ("In fine, the government argues that any defendant encumbered by an ICE detainer must be detained pending trial or sentence. This cannot be."); *see also United States v. Ventura*, No. 17-CR-418 (DLI), 2017 WL 5129012, at *3 (E.D.N.Y. Nov. 3, 2017) ("[O]nce prosecution is the Government's chosen course of action, the Executive may not attempt to obviate the bond determination of this Court by enforcing the ICE detainer."); *United States v. Brown*, No. 4-15-CR-102, 2017 WL 3310689, at *5 (D.N.D. July 31, 2017) ("the Government's ICE-detainer argument is at odds with the plain text of the Bail Reform Act"); *United States v. Blas*, No. CRIM. 13-0178-WS-C, 2013 WL 5317228, at *6 (S.D. Ala. Sept. 30, 2013); *United States v. Montoya-Vasquez*, No. 4:08-CR-3174, 2009 WL 103596, at *5 (D. Neb. Jan. 13, 2009) ("Such a harsh result is nowhere expressed or even implied in the Bail Reform Act."). These courts have generally refused to let Congress' specific detention plan in the BRA "simply be overruled by an ICE detainer. No other factor [would] matter[]; neither danger to the community nor risk of flight, nor any kind of individualized consideration of a person before the Court. Each, according to the government, [would be] swallowed by an ICE detainer." *Barrera-Omana*, 638 F. Supp. 2d at 1111.

The government nonetheless has been successful in the Courts of Appeals. In recent published opinions, the Third

Circuit, Sixth Circuit, and D.C. Circuit held that ICE may override a Magistrate Judge's Order of Release.[10]

The Fifth Circuit may agree with its colleagues; it is "always chary to create a circuit split." *Gahagan v. United States Citizenship & Immigration Servs.*, 911 F.3d 298, 304 (5th Cir. 2018) (quotation marks and citation omitted). At the same time, the Fifth Circuit has been more than willing to break with "the majority of [its] sister circuits" when it concludes that those circuits have misread the text and plain meaning of federal statutes. *Matter of Benjamin*, 932 F.3d 293, 298 (5th Cir. 2019) (citing SCALIA & GARNER). Until the appellate court speaks, all this Court can do is summarize the other circuits' decisions and explain why it finds them unpersuasive.

We begin with the government's best case.

### 1.        Third Circuit

The facts of *United States v. Soriano Nunez*, 928 F.3d 240 (3d Cir. 2019), are almost identical to our case. There, an alien was charged with using a false Social Security number, was ordered released by the Magistrate Judge and the District Judge, was taken into custody by ICE for removal proceedings, and challenged her detention in a second round of motion practice before the District Court. *Id.* at 243. The District Court denied her motion. It reasoned that "the INA, 8 U.S.C. § 1226(a)(1), allowed ICE to detain Soriano Nunez during the pendency of removal proceedings notwithstanding the parallel criminal action . . . ." *Id.*

---

[10] Late last week, the Second Circuit released an opinion agreeing with its sister circuits. *See United States v. Lett*, No. 18-749-CR, 2019 WL 6752763 (2d Cir. Dec. 12, 2019).

The text of 8 U.S.C. § 1226 is not so definitive. As mentioned earlier, it begins by providing that upon a warrant issued by the Secretary of Homeland Security, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The Secretary "may continue to detain the arrested alien," or instead may release the alien on bond or conditional parole. *Id.* § 1226(a)(1)-(2). If, however, the alien is a convicted criminal or has been removed previously, this discretion evaporates: the Secretary "shall" detain the alien immediately. *Id.* § 1226(c)(1).

Nothing in § 1226(a)(1) states that it supersedes the BRA. Nothing in the statute gives ICE permission to circumvent a Magistrate Judge's detention order. As it applied to Soriano Nunez's situation, the statute did not require ICE to detain Soriano Nunez.

The Third Circuit nevertheless permitted ICE's action. It gave four reasons.

First, it held that "nothing in the BRA gives a district court the authority to compel another sovereign or judge in federal administrative proceedings to release or detain a defendant." 928 F.3d at 246. But that is not the issue here. There is no other sovereign in these cases; both the U.S. Attorney's Office and ICE represent the Executive Branch and ultimately report to the President of the United States. Defendants like Baltazar-Sebastian are also not asking a Magistrate Judge to override an Immigration Judge. Their sole request is that the Magistrate Judge's pretrial release order control during the pendency of the criminal case. The Immigration Judge can consider detention at the conclusion of the criminal matter.

Second, the Third Circuit held that the 10-day notice provision in 18 U.S.C. § 3142(d) revealed "Congress' recognition that immigration authorities and state sovereigns have separate interests." *Id.* As a general principle, the point is not controversial. But it is not a very compelling textual argument in these cases since, as the attorney from Main Justice conceded at our hearing on reconsideration, § 3142(d) "does not apply in this case." Transcript of Hearing at 70: 11-12 (Nov. 18, 2019).

She is correct. Section 3142(d) applies only to persons who may flee or pose a danger. The Magistrate Judges who considered Soriano Nunez and Baltazar-Sebastian's motions for pretrial release never reached this part of the statute because the defendants were not dangerous or flight risks. And it is strange to look at the BRA, a statute which expressly subjects non-dangerous aliens to the same bond eligibility as citizens, thereby authorizing their pretrial release, and conclude from it that all aliens may be detained.

Third, the appellate court made a factual finding that "detention for removal purposes does not infringe on an Article III court's role in criminal proceedings." 928 F.3d at 246. Perhaps that is true in the Third Circuit. It is not true here.

One set of problems arises from the defense team's impaired ability to prepare for trial. ICE has been detaining Mississippi's alien-defendants at facilities in Jena and Basile, Louisi-

ana, which are 163 and 262 miles away from Jackson, Mississippi, respectively.[11] Court-appointed defense attorneys require a full day to travel there and back—all the while charging the federal government—and Baltazar-Sebastian's counsel suggested at the hearing that her client's detention center has no rooms for attorney-client discussion.[12]

Another set of problems arises from the fact that ICE has broken its promise to work with Court staff on facilitating criminal hearings. Incredibly, the Court learned at the hearing that it is not uncommon for ICE to deport defendants while their criminal cases are pending. Tr. at 59: 16-19.

In *United States v. Agustin-Gabriel*, for example, the court issued a Writ of Habeas Corpus Ad Testificandum directing ICE to bring the defendant to Jackson for his change of plea hearing, only to discover at the hearing that the defendant had been deported weeks earlier. *See* No. 3:19-CR-198-TSL-FKB, Docket Nos. 31-35 (S.D. Miss. 2019).[13] The government has now told the District Judge presiding over that matter that "[t]he Defendant may properly reenter the United States to resolve this pending criminal matter, by applying to the nearest Consular Services office in a United States Embassy or Consulate, and requesting a parole to reenter the United

---

[11] At the last hearing, an ICE supervisor testified that there are no Immigration Judges in the entire State of Mississippi.

[12] The testimony on this point was inconclusive.

[13] In *Agustin-Gabriel*, the Magistrate Judge released the defendant on bond after a detention hearing, after which ICE took the defendant into custody. The defense attorney and prosecutor are now arguing over whether the criminal case should be dismissed, or instead whether the defendant should be added to the Fugitive Docket.

States for law enforcement purposes." Docket No. 35 at 2.[14] But that argument is difficult to reconcile with the government's assurance in this matter that "if ICE were to remove [Baltazar-Sebastian] during the pendency of this case, the government would, of course, concede it could not continue its prosecution of her." Tr. at 66: 7-9. Suffice it to say that criminal proceedings in the Southern District of Mississippi *have* been stymied by ICE.

The Third Circuit concluded with its claim that the judiciary is trying to force "the Executive to choose which laws to enforce." 928 F.3d at 247 (citation omitted). It's just not true. The United States Attorney has brought these cases to the grand jury and into court. We are hearing each and every one of them. Our Magistrate Judges, probation officers, courtroom deputies, court reporters, and public defenders—Article III employees all—have bent over backwards to accommodate the influx of indictments and detention hearings necessitated by these enforcement actions.[15] We are doing so to respect the Executive's enforcement decisions, not to challenge them.

_____

[14] The government's filing then claims that "[t]he Court retains discretion and authority to manage its docket, and to govern any case before it so as to preserve the Court's jurisdiction." Docket No. 35 at 3 (citing Justice Cardozo). If the government had honored that principle in the first place, it would have obeyed the Magistrate Judge's detention order.

[15] Working with the Administrative Office of the Courts, our court made sure that defendants and their counsel had interpreters so that the accused would not be deprived of their Sixth Amendment protections. The defendants spoke various languages and indigenous dialects. Coordinating this was no easy task as the court ensured that counsel could meet with their clients in advance of each defendant's hearing. The coordination was made more difficult because the defendants were not being held in any

The Executive Branch may have its cake and eat it too. It may pursue criminal charges to their conclusion *and* deport these defendants. What the text of the statutes and regulations indicate is how to sequence these actions to provide for both criminal and civil proceedings. Once the right hand of the Executive Branch (DOJ) has come into court and submitted a case to the Magistrate Judge, its left hand (ICE) should not be permitted to circumvent the Magistrate Judge's Order during the pendency of the criminal case.

\* \* \*

For these reasons, this Court respectfully believes that the Third Circuit erred. Its failure to mention 8 C.F.R. § 215 is particularly odd. Section 215 serves as a central part of the textual analysis conducted by the sizeable number of district courts that ruled similarly to how this Court rules today. The federal regulation declares removal prejudicial to the government's active criminal case, so to omit any consideration of § 215 results in an incomplete analysis.

Rather than address DHS' own regulations, the Third Circuit departs from textualism to focus on general principles like dual sovereignty—despite dual sovereignty not being implicated by this case. And it then misses the equally-significant principle at stake: that the Executive Branch cannot disregard a Magistrate Judge's lawful order.

---

local facilities. In addition, the judges and court personnel interrupted all other scheduled matters to conduct these detention hearings because the BRA required that these hearings be held.

### 2.     Sixth Circuit

The Sixth Circuit case the government relies upon is even less compelling.

In *United States v. Veloz-Alonso*, 910 F.3d 266 (6th Cir. 2018), the defendant was charged with illegal reentry into the United States. The case was cut-and-dry—the defendant had been removed from the country three times previously—so he promptly pleaded guilty. *Id.* at 267. He then moved for release on bond pending sentencing. *Id.*

The District Court consulted the part of the BRA applicable to convicted defendants, 18 U.S.C. § 3143. That statute provides that a "judicial officer *shall* order that a person who has been found guilty of an offense in a case . . . and is awaiting imposition or execution of sentence be *detained* unless--"

> (A)(i)  the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
>
> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> (B)     the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2) (emphasis added). The District Judge concluded, as a factual matter, that the defendant met the criteria necessary to overcome the presumption of detention and therefore was required to be released.

The Sixth Circuit reversed. It found that § 3143 is a "permissive" law because it allows, but does not mandate, a judicial officer to release a defendant on bond. *Veloz-Alonso*, 910 F.3d at 269. In contrast, the appellate court observed, the INA section governing "illegal aliens with final deportation orders, such as Veloz-Alonso, [has] no ambiguity: ICE is authorized and mandated under the INA to detain and deport." *Id.* (citing 8 U.S.C. § 1231(a)). Thus, even if a judicial officer decides under the BRA to release a convicted alien-defendant before sentencing, the Sixth Circuit implicitly held that the INA's mandate overrides § 3143 of the BRA. *Id.* at 270.

The Sixth Circuit's decision has little application to our case. Veloz-Alonso was already subject to a final removal order and its attendant consequences. *See* 8 U.S.C. § 1231(a). Veloz-Alonso was also subject to the more stringent portion of the BRA governing persons awaiting sentencing. *See* 18 U.S.C. § 3143. Baltazar-Sebastian is not subject to either of those sections. She has never been removed and has not pleaded guilty to the criminal charge. The BRA and INA simply apply differently to her.

Even if the facts were closer, this Court is not sure that the Sixth Circuit's permissive-versus-mandatory framework is correct. The BRA may look "permissive" to an appellate court forced to consider all sorts of hypothetical fact patterns. To a Magistrate Judge presiding over a detention hearing, however, the BRA's mandatory nature becomes apparent. If a person like Baltazar-Sebastian presents evidence that she is not dangerous and will appear for future proceedings, the Magistrate Judge "*shall* order" her pretrial release. 18 U.S.C.

§ 3142(b) (emphasis added). From a Magistrate Judge's courtroom, the BRA is neither permissive nor mandatory: it is *conditional*. Pretrial detention turns on the evidence presented.

When seen in this light, the Sixth Circuit case was actually more complicated than the court acknowledged. Based on the clear and convincing evidence presented at the detention hearing, § 3143(a) of the BRA *required* the District Judge to release the defendant before sentencing. And based on the defendant's prior removal order, § 1231(a)(5) of the INA *required* ICE to remove the defendant. Courts have a duty to try and reconcile statutes, but it is not clear how this particular dilemma should have been reconciled. Fortunately, that is not our situation and can be avoided today.

The Court will now turn to the government's final supporting case.

### 3. D.C. Circuit

In *United States v. Vasquez-Benitez*, the government charged the defendant with illegal reentry. 919 F.3d 546, 548 (D.C. Cir. 2019). A Magistrate Judge and a District Judge determined that the defendant did not need to be detained before trial, and released him on conditions. *Id.* at 549. ICE then took him into custody. *Id.* The defendant moved to compel his release from ICE custody. *Id.* at 550. The case was reassigned to a different District Judge, who held two more hearings and concluded that the defendant should be released from ICE custody. *Id.*

The D.C. Circuit reversed. It did not "see a statutory conflict," and found that "the Department of Homeland Security's detention of a criminal defendant alien for the purpose of re-

moval does not infringe on the judiciary's role in criminal proceedings." *Id.* at 552. The court endorsed the Sixth Circuit's permissive-versus-mandatory construction, choosing to interpret the BRA as permissive rather than conditional.[16] *Id.* at 553.

As before, this Court believes that the D.C. Circuit's interpretation did not fully consider the text of the BRA and 8 C.F.R. § 215.3(g). But any conflict is again avoidable because of our differing facts. In the D.C. Circuit case, the defendant was already subject to a final removal order, so the INA mandated detention. *Id.* at 549; *see* 8 U.S.C. § 1231(a)(5). Baltazar-Sebastian is not subject to a final removal order. The INA does not mandate her detention, and the BRA *does* mandate her pretrial release. Reading these authorities together suggests that the BRA should be followed during the pendency of her criminal case.

## C.    Considerations on Appeal

The government is entitled to take an interlocutory appeal. *See* 18 U.S.C. § 3145(c). It has indicated that it will pursue that relief.

This Court respectfully requests that the Fifth Circuit's resulting decision not only adjudicate the legal issues, but also help

---

[16] Somewhat confusingly, the D.C. Circuit hedged at the end of its opinion, writing, "our holding is limited—we conclude only that the district court erred in prohibiting the U.S. Marshal from returning Vasquez-Benitez to ICE based on the mistaken belief that 'the BRA provides the exclusive means of detaining a defendant criminally charged with illegal reentry.'" *Vasquez-Benitez*, 919 F.3d at 553-54 (citation omitted).

the judges of the trial courts fulfill our duty "to eliminate unjustifiable expense and delay" in criminal proceedings. Fed. R. Crim. P. 2. Magistrate Judges, Assistant U.S. Attorneys, Assistant Federal Public Defenders, CJA panel attorneys, Deputy U.S. Marshals, and Probation Officers have spent an extraordinary amount of time arranging and conducting detention hearings and other criminal proceedings in these cases. Our Magistrate Judges have determined that a number of the accused are acceptable candidates for pretrial release. Yet, when Magistrate Judges have ordered their release under carefully-crafted conditions, ICE has shoved those findings aside in direct contravention of the Magistrate Judge's orders. These hearings and orders are rendered a nullity.

The easiest resolution, administratively speaking, would be if Magistrate Judges could be relieved from their obligation under the BRA to conduct detention hearings for alien-defendants, so all involved could uniformly defer to ICE detention. However, in this Court's view, the Magistrate Judges are bound by the statute, and relief from any obligation under the BRA would contradict Congress' instructions. Alternatively, perhaps the appellate court could clarify for ICE when its detention of an alien-defendant like Baltazar-Sebastian can commence. Either way, all involved would appreciate some clear instructions.

## IV.  Conclusion

Ultimately, whether to pursue deportation proceedings, criminal prosecution, or both, is up to the Executive Branch. However, once the Executive invokes the jurisdiction of this Court, the government cannot then circumvent an Order of Release under the BRA by way of the INA. Such interference with the

criminal proceedings does not honor both statutes and presents a practical problem with the administration of justice. Accordingly, the government's motion for reconsideration is denied.

The defendant shall remain released subject to the conditions previously set by the Magistrate Judge.

SO ORDERED, this the 19th day of December, 2019.

s/ CARLTON W. REEVES
*United States District Judge*
